**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| AMELIA COON,<br><br>Plaintiff,<br><br>v.<br><br>BRIAN T. MOYNIHAN, LIONEL L. NOWELL III, SHARON L. ALLEN, JOSE E. ALMEIDA, ARNOLD W. DONALD, JIM FITTERLING, MONICA C. LOZANO, MARIA W. MARTINEZ, DENISE L. RAMOS, CLAYTON S. ROSE, WILL B. THOMAS, MICHAEL D. WHITE, THOMAS D. WOODS, MARIA T. ZUBER, PIERRE de WECK and LINDA HUDSON,<br><br>Defendants,<br><br>BANK OF AMERICA, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Amelia Coon ("Plaintiff"), by and through her undersigned counsel, brings this shareholder derivative action on behalf of Nominal Defendant Bank of America, Inc. ("BAC" or the "Company") and against defendants Brian T. Moynihan, Lionel L. Nowell III, Sharon L. Allen, Jose E. Almeida, Arnold W. Donald, Jim Fitterling, Monica C. Lozano, Maria W. Martinez, Denise L. Ramos, Clayton S. Rose, Will B. Thomas, Michael D. White, Thomas D. Woods, Maria T. Zuber, Pierre de Weck and Linda Hudson (collectively, the "Individual Defendants") for breaches of the directors' fiduciary duties, and for violations of Section 14(a) of the Securities Exchange Act of 1934 and rules thereof. Plaintiff alleges the following against the Defendants based upon personal knowledge as to herself and her acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the public documents, transcripts of conference calls and

announcements made by BAC, United States Securities and Exchange Commission ("SEC") the proceedings brought by the Department of the Treasury ("FinCen"), the Office of Controller of the Company ("OCC") and wire and press releases published by, and regarding, BAC, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.

## NATURE OF THE ACTION

1. Plaintiff brings this shareholder derivative action against Bank of America directors for their fiduciary breaches as described herein for their failure to comply with their obligations under the government orders described herein, (which they signed) and to implement, maintain and/or monitor proper compliance information systems in the anti-money-laundering, transaction monitoring, and financial-crime compliance systems required under the orders and under the anti-money laundering and other provisions of the Bank Secrecy Act in the face of numerous red flags brought to their attention and/or as to which they were "willfully blind."

2. For decades, and as the second largest bank in the United States, Bank of America was required by regulation to maintain internal compliance systems intended to detect and escalate suspicious financial activity. According to the FinCen division United States Department of the Treasury ("Treasury Department"), in the 2026 "Consent Order Imposing Civil Money Penalty," BAC did not have the necessary systems in an anti-money laundering program ("AML Program") and directors exhibited "reckless disregard or willful blindness" were actual willful participants in the behavior that constituted violations of the Bank Secrecy Act ("BSA") 12 U.S.C. §§ 1829(b); 1951-1960; 31 U.S.C. §§ 5311-5314; 5316-5376.

3. In late 2024, BAC's non-compliant practices drew regulatory attention and resulted in the first cease and desist order described herein.

4. But BAC directors failed to keep BAC compliant with the December 2024 OCC "Cease And Desist Order Against Bank of America for BSA Deficiency ("2024 OCC Order") which imposed legal obligations on both BAC and BAC directors.

5. Fundamental compliance deficiencies persisted after the 2024 Consent Order, exposing the Company to substantial regulatory penalties and requiring significant further investment in remediation, including the hiring of thousands of investigators. Consequently, Defendants' repeated assurances about the limited scope of the Company's compliance issues, its remediation progress, and the expected financial impact lacked a reasonable basis and omitted material adverse facts. In addition the foregoing Defendants misled Bank of America investors by touting the Company's progress in carrying out those required corrective actions while downplaying the scope and financial consequences of its compliance failures with the 2024 Order. During the Class Period, Defendants portrayed the deficiencies underlying the 2024 Consent Order as "relating to certain aspects" of BANA's processes and claimed that the Company had "already completed significant steps to satisfy requirements of the Consent Order" and did not believe the compliance issues would have a "material adverse financial impact on the Corporation." In reality, the failures were systemic, affected multiple core compliance functions across the Company's business lines, and remained inadequately remediated despite years of internal warnings and regulatory intervention.

6. On October 13, 2026, the Financial Crimes Enforcement Network ("FinCEN") announced a historical, $1.2 billion civil monetary penalty against Bank of America arising from failures in its anti-money-laundering compliance program. In addition, the Office of the

Comptroller of the Currency ("OCC") separately determined that Bank of America's compliance program was deficient and ineffective and that significant deficiencies persisted despite prior regulatory intervention. The Treasury Department described it as “the third largest penalty in Treasury history and the largest in the history of the Office of the Comptroller of the currency.”

7. In resolving the enforcement proceeding, Bank of America admitted to “willful” violations of the BSA.

8. Banking regulators stated that Bank of America prioritized revenue over the correcting the deficiencies in its compliance with BSA and AML laws.

9. Compounding their flagrant refusal to comply with the 2024 OCC Order, Defendants also failed to make truthful and accurate disclosures in SEC filings they signed which rendered statements therein concerning the integrity, security, and monitoring of its banking services materially misleading.

10. The truth began to emerge after the market closed on October 13, 2026, when the U.S. Department of Treasury announced coordinated enforcement actions against BANA resulting in more than $1.21 billion in penalties and settlements. The Financial Crimes Enforcement Network ("FinCEN") assessed a $1.2 billion penalty, including credit for a $750 million penalty imposed by the OCC, and the Office of Foreign Assets Control ("OFAC") separately announced an $11.6 million settlement. In its order, FinCEN stated that BANA admitted that it willfully violated the BSA and missed or delayed detecting and reporting more than $5 billion in suspicious activity. The OCC further found that, despite the 2024 Consent Order, BANA had failed to complete significant corrective steps and its BSA/AML program remained deficient.

11. The truth continued to emerge the following morning, October 14, 2026, when Bank of America reported its third quarter 2026 results, showing that the regulatory settlement

charge reduced diluted earnings per share by $0.17. During the earnings call later that morning, J.P. Morgan analyst Vivek Juneja called the charge "obviously a surprise" and described the fallout as "a reputational and confidence issue." He pressed management to explain why investors should believe the problems were behind the Company given "the risk of more charges or more expenses." Following the enforcement announcements and quarterly results, Bank of America's stock price fell to an intraday low of $49.26 on October 14, 2026, before closing at $51.39, **down 4.8%** from the previous day's closing price of $53.96.

## II.

## JURISDICTION AND VENUE

12. ***Subject Matter Jurisdiction.*** This Court has subject matter jurisdiction under diversity jurisdiction and federal question jurisdiction, pursuant to 28 U.S.C. § 1331 because the claims originally asserted in the complaint arose under and pursuant to § 14 of the Exchange Act and Rule 14(a)-9 promulgated thereunder and diversity jurisdiction because there is minimal diversity between the litigants including Plaintiff Coon, who is domiciled in Connecticut, and Defendant Bank of America, N.A., a Delaware corporation with major operations in this District and Public records and the official BAC director list do not list any directors residing in Connecticut.

13. The amount of damages, sought in this complaint exceed $75,000.

14. The court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they related to Plaintiff's claims under 15 U.S.C. §78n(a).

15. ***Personal Jurisdiction.*** This Court has personal jurisdiction over the litigants because Defendant registered to do business in New York and conducts significant business operations in New York as well and under the Securities Exchange Act of 1934.

16. ***Venue.*** Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) because nominal defendant maintains a huge corporate office at Bank of America Tower in Manhattan.

## III.

## PARTIES

### 1. Plaintiff

17. Plaintiff Amelia Coon is a current shareholder of BAC common stock and has been at all times since April 2019. Plaintiff is a citizen of Connecticut. Plaintiff, a current shareholder of BAC throughout the period of the alleged wrongdoing by the Individual Defendants, is committed to adequately and fairly representing the Company's interests in pursuing and enforcing its rights. The plaintiff is represented by counsel competent and experienced in derivative litigation.

18. Plaintiff has filed this derivative action on behalf of the Company to address and remedy the injuries incurred as a direct consequence of the breaches of fiduciary duties committed by the Director Defendants.

### 2. Defendants

#### A. Nominal Defendant

19. Defendant Bank of America, N.A. is a national banking association with its main office in Charlotte, North Carolina, and conducts substantial banking operations within New York at Bank of America Tower in midtown Manhattan.

20. BAC is included as a nominal party in this action and its presence is not a collusive attempt to confer jurisdiction on this Court that it would not otherwise possess.

**B. Current Directors Named As Defendants**

21. Defendant Brian T. Moynihan ("Moynihan") is the Chairman of the Board and CEO and has been since 2010.

22. Defendant Lionel L. Nowell, III ("Nowell") is the lead independent director and has been a director since 2013.

23. Defendant Sharon L. Allen ("Allen") is a director and has been since 2012.

24. Defending Jose Almeida ("Almeida") is a director and has been since 2022.

25. Defendant Arnold W. Donald is a defendant and has been since 2013.

26. Defendant, Jim Fitterling ("Fitterling") is a director.

27. Defendant Monica C. Lozano ("Lozano") is a director and has been since 2006.

28. Defendant Marla N. Martinez ("Martinez") is a director and has been since 2025.

29. Defendant Denise L. Ramos ("Ramos") is a director and has been since 2011.

30. Defendant Clayton S. Rose ("Rose") is a director and has been since 2018.

31. Defendant William B. Thomas ("Thomas") is a director.

32. Defendant Michael D. White ("White") is a director and has been since 2016.

33. Defendant Thomas D. Woods ("Woods") is a director and has been since 2016.

34. Defendant Maria T. Zuber ("Zuber") is a director and has been since 2017.

35. All "Current Directors" except Fitterling signed the 2024 Consent Order which imposed proactive obligations on each member BAC's Board and each Board member signed the 2024 Consent Order.

**C. Former Directors Named As Defendants**

36. Defendant Pierre de Weck was a BAC director from 2013 to 2025.

37. Defendant Linda Hudson was a director from 2012 to 2025.

38. Defendants de Weck and Hudson also signed the 2024 Consent Order.

**D. Committee Memberships**

39. The Company has four standing committees listed on its website in the Corporate Governance section, an Audit Committee, a Compensation and Human Capital Committee, a Corporate Governance Committee and an Enterprise Risk Committee. Despite a clear directive in the 2024 Order, BAC does not identify a "Compliance Committee" among its Board's standing committees.

40. Defendants Allen, Almeida, Donald, Ramos, Thomas and White were and are members of the Audit Committee. Allen was and is the Chairman.

41. Defendants Almeida, Donald, Fitterling, Lozano, Ramos and Rose were and are members of the Compensation and Human Capital Committee. Lozano was and is the Chairman.

42. Defendants Allen, Martinez, Thomas, White, Woods and Zuber were and are members of the Corporate Governance Committee. White was and is the Chairman.

43. Defendants Fitterling, Lozano, Martinez, Rose, Woods and Zuber were and are members of the Enterprise Risk Committee, and Rose was and is the Chairman.

## IV.

## FIDUCIARY AND OTHER DUTIES OF THE INDIVIDUAL DEFENDANTS AND SRS

**A. Relevant Governance Policies And Codes**

44. Bank of America has a Code of Conduct applicable to all employees. Bank of America also has an Anti-Money Laundering Compliance Program which is reflected in its Compliance Program Letter.

**B. Committee Member Responsibilities**

45. There is an Audit Committee ("AC") charter. Effective March 2025 there is a Corporate Governance Committee ("CGC") and there is an Enterprise Risk Committee ("ERC")

charter effective June 24, 2025. Effective June 25, 2025 there is a Compensation and Human Capital Committee Charter ("CHCC").

46. Bank of America's Proxy statements have described the "Key Responsibilities" of relevant committees as follows:

Audit Committee

**Key responsibilities**

- Oversees the qualifications, performance, independence, and appointment of our company's independent registered public accounting firm
- Oversees the performance of our company's corporate audit function
- Oversees the integrity of our company's consolidated financial statements' preparation
- Oversees our compliance with legal and regulatory requirements
- Makes inquiries of management or of the Chief Audit Executive to assess the scope and resources necessary for the corporate audit function to execute its responsibilities

Enterprise Risk Committee

**Key responsibilities**

- Oversees our company's overall Risk Framework, risk appetite, and management of key risks: strategic, credit, market, liquidity, operational (including third-party, model, conduct, technology, information security, and data), compliance (including financial crimes compliance), reputational, and other risks that span multiple key risk types
- Approves the Risk Framework and Risk Appetite Statement and further recommends each to the Board for approval
- Oversees management's alignment of our company's risk profile to our strategic and financial plans

> ° Oversees management's progress in developing our company's Comprehensive Capital Analysis and Review submission to the Federal Reserve Board, and reviews and recommends our company's Capital Plan to the Board for approval
>
> ° Reviews periodically with the Chief Risk Officer the adequacy of the resources of the company's independent risk management function

47. In the Proxy, BAC's board touted its robust risk oversight structure:

> Our Chief Risk Officer, the company's senior-most risk manager, who also oversees our Global Compliance and Operational Risk organization, reports jointly to the CEO and to the Enterprise Risk Committee, and participates in Board and Enterprise Risk Committee meetings, including meeting regularly in executive session with the Enterprise Risk Committee. In addition, our Lead Independent Director meets at least quarterly with our Chief Risk Officer. This governance structure is designed to complement our Board's overall commitment to maintaining an objective, independent Board and committee leadership structure and fostering integrity over risk management throughout our company.

## C. <u>Fiduciary Duties Of Officers, Directors Of BAC</u>

48. By reason of their positions as officers, and/or directors, of BAC, the Individual Defendants owed BAC and its shareholders fiduciary obligations of trust, loyalty, good faith, due care, and candor and were and are required to use their utmost ability to control and manage BAC in a fair, just, open, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of BAC and its shareholders.

49. Each Individual Defendant owes to BAC and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and to adhere to the highest obligations of fair dealing.

50. To discharge their duties, the Individual Defendants of BAC were required to exercise reasonable and prudent supervision over the management, policies, controls, and

operations of the Company and formulate adequate information systems and procedures to recognize and address conflicts of interest and monitor and manage related party transactions.

51. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of BAC, a failure to enforce BAC's standards and codes and policies, and compliance with the law, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

52. By virtue of such duties, the officers and directors of BAC were required to, among other things most relevant here:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, and the United States federal securities laws, other regulatory laws and orders, and pursuant to BAC's corporate governance;

(b) establish and maintain systematic and accurate records and reports of the business and internal affairs of BAC and procedures for the reporting of the business and internal affairs to the Board which involve compliance with consent orders and cease and desist and other orders;

(c) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that BAC's operations would comply with all applicable laws including but not limited to AML and BSA laws and BAC's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate and in full compliance with applicable laws and rules; and

(d) exercise reasonable control and supervision over the contents of proxies used to seek shareholder action such a votes for directors and other proposals on the ballots.

## V.

## SUBSTANTIVE ALLEGATIONS

### A. The Company's Compliance Failures and the 2024 Consent Order

53. Bank of America conducts its banking operations primarily through BANA. As a national banking association, BANA is required to maintain a Bank Secrecy Act/anti-money laundering ("BSA/AML) compliance program reasonably designed to ensure compliance with the BSA and its implementing regulations. Those requirements include identifying and reporting suspicious transactions and conducting customer due diligence to understand and monitor the risks associated with customer relationships. BANA is also required to maintain sanctions compliance controls to identify transactions and relationships prohibited by applicable economic sanctions.

54. Effective compliance depended on the Company's ability to identify potentially suspicious transactions, escalate them for investigation, and timely report suspicious activity. Transaction-monitoring thresholds determined which alerts were referred for investigation, while adequate staffing and investigative resources were necessary to evaluate those alerts and prepare suspicious activity reports ("SARs"). Accordingly, weaknesses in the Company's monitoring thresholds or investigative resources could prevent suspicious activity from being identified, investigated, and reported.

55. On December 23, 2024, the OCC issued the 2024 OCC Consent Order, which identified deficiencies in BAC's BSA/AML and sanctions compliance programs, including breakdowns in its processes for identifying, evaluating, and reporting suspicious activity. The OCC found that BAC had failed to maintain appropriate thresholds for determining when transaction

alerts should trigger investigations, failed to dedicate sufficient resources to investigations, and failed to comply with suspicious activity reports ("SARs") filing requirements. The OCC also found that BAC had made insufficient progress toward correcting a previously identified deficiency in its customer due diligence processes. The 2024 Consent Order between BAC and the OCC entered in 2024, itself referenced a "failure to correct a previously reported BSA compliance problem." BAC consented to the 2024 Consent Order without admitting or denying the OCC's findings. It was signed by all director defendants except Fitterling.

56. The 2024 Consent Order identified deficiencies extending across the Company's BSA/AML and sanctions compliance functions, including internal controls, governance, transaction monitoring and models, suspicious activity investigation and reporting, due diligence, risk assessments, staffing, internal audit, and training. To address these deficiencies, the order required BANA to establish a board compliance committee within 30 days, propose an independent consultant within 60 days to conduct a comprehensive assessment of its compliance programs, and submit a corrective-action plan within 90 days identifying responsible personnel and completion timelines. The 2024 Consent Order also required independent historical transaction reviews to determine whether suspicious activity had been appropriately reported.

57. The 2024 Consent Order further required ongoing oversight of the Company's remediation efforts. The 2024 Consent Order mandated the formation of a board level Compliance Committee was required to review implementation of the corrective-action plan at least quarterly. BAC's dedicated BSA Officer was required to prepare progress reports identifying the corrective actions undertaken, their results and status, and outstanding corrective actions and the persons responsible for completing them. These reports were to be submitted to the Board and forwarded to the OCC.

58. The OCC's 2024 "Findings" (which BAC neither admitted nor denied) included:

- The Bank failed to develop and provide for the continued administration of a program reasonably designed to assure and monitor BSA compliance, resulting in a violation of 12 C.F.R. § 21.21. *See also* 12 U.S.C. § 1818(s)(3)(A).

- The Bank had a breakdown in its policies, procedures, and processes to identify, evaluate, and report suspicious activity, including the Bank's systemic failure to ensure that its transaction monitoring system had appropriate thresholds for determining when transaction alerts should trigger a case investigation; the Bank's failure to ensure sufficient resources dedicated to case investigations; and noncompliance with the SAR filing requirement, resulting in violations of 12 C.F.R. § 21.11.

- The Bank failed to make acceptable substantial progress towards correcting a deficiency related to the Bank's Customer Due Diligence ("CDD") processes that was previously reported to the Bank by the OCC. *See* 12 U.S.C. § 1818(s)(3)(B).

- The Bank engaged in unsafe or unsound practices related to its Sanctions (as defined below) compliance; BSA Compliance Program, including internal controls; governance; transaction monitoring and models; suspicious activity monitoring, investigation, and reporting; due diligence; risk assessments; BSA officer; staffing; internal audit; and training.

59. The 2024 Order directed "the Compliance Committee shall monitor and oversee the Bank's compliance with the provisions of this Order."

60. The 2024 Order made additional directives to direct the Compliance Committee:

- The Compliance Committee shall ensure the Bank promptly adopts the Action Plan and shall verify that the Bank implements and adheres to the Action Plan, including the timelines set forth within the Action Plan.

- The Compliance Committee shall review the effectiveness of the Bank's implementation of and adherence to the Action Plan at least quarterly, and more frequently if necessary.

- The BSA Officer shall prepare, and the Compliance Committee shall submit to the Board, a written progress report setting forth in detail:

  (a) the specific corrective actions undertaken pursuant to the Action Plan;

  (b) the results and status of the corrective actions; and

  (c) a description of the outstanding corrective actions and the party or parties responsible for the completion of outstanding corrective actions.

- the Bank shall develop, implement, and thereafter adhere to a written program to:

  (a) enhance Board and senior management oversight of the Bank's BSA and Sanctions Compliance Programs; and

  (b) ensure safe and sound corporate governance and decision-making processes related to BSA and sanctions compliance ("Oversight Enhancement Program").

Refer to the *FFIEC Bank Secrecy Act/Anti-Money Laundering Examination Manual*: "BSA Compliance Program Structures—Overview" (Rev. Feb. 2015) and the "Corporate and Risk Governance" booklet of the *Comptroller's Handbook*.

- The Compliance Committee shall ensure that management effectively remediates any gaps and deficiencies in the Bank's transaction monitoring systems identified by the TM Validation or TM Look-Back Consultants. The Bank shall incorporate its plan to implement effective remediation of any identified gaps and deficiencies into the Action Plan required by Article IV of the Order.

- The Compliance Committee shall ensure that management effectively remediates all gaps and deficiencies in the Bank's suspicious activity monitoring, investigation, decisioning, and reporting associated with negotiable instruments identified by the NGI Look-Back Consultant. The Bank shall incorporate its plan to implement effective remediation of

any identified gaps and deficiencies into the Action Plan required by Article IV of the Order.

- The Compliance Committee shall ensure the Bank has sufficient staff with appropriate skills and expertise needed to support the BSA Officer and the Bank's BSA Compliance Program and that such staff is vested with sufficient authority to fulfill their respective duties and responsibilities. The Compliance Committee shall also ensure that Bank policies and procedures clearly outline the BSA responsibilities of senior managers and line of business employees, including any independent contractors. The Board shall also ensure the performance evaluation process for senior managers and line of business managers incorporates BSA compliance.

- The Board, directly or through one of its committees, shall ensure that the Bank has timely adopted and implemented all corrective actions required by this Order, and shall verify that the Bank adheres to the corrective actions and they are effective in addressing the Bank's deficiencies that resulted in this Order. The full Board remains ultimately responsible for ensuring the Bank's BSA and Sanctions compliance and compliance with this Order.

- In each instance in which this Order imposes responsibilities upon the Board or one of its committees, it is intended to mean that the Board shall:

  (a) authorize, direct, and adopt corrective actions on behalf of the Bank as may be necessary to perform the obligations and undertakings imposed on the Board by this Order;

  (b) ensure the Bank has sufficient processes, management, personnel, control systems, and corporate and risk governance to implement and adhere to all provisions of this Order;

  (c) require that Bank management and personnel have sufficient knowledge, expertise, training and authority to execute their duties and responsibilities pertaining to or resulting from this Order;

(d) hold Bank management and personnel accountable for executing their duties and responsibilities pertaining to or resulting from this Order;

(e) require appropriate, adequate, and timely reporting to the Board by Bank management of corrective actions directed by the Board to be taken under the terms of this Order; and

(f) address any noncompliance with corrective actions in a timely and appropriate manner.

61. BAC, "by and through its duly elected and acting Board of Directors. . ." consented to the issuance of the Consent Order. In fact, the Consent Order was signed on November 27, 2024 by defendants Moynihan, Allen, Almeida, de Weck, Donald, Hudson, Lozano, Nowell III, Ramos, Rose, White, Woods and Zuber.

62. Accordingly, upon violation of the terms of the 2024 Consent Order the OCC could, and here did, impose penalties, including large civil money penalties, business restrictions, mandated new board processes and accountability. Defendants' violations of the 2024 Consent Order were therefore violations of positive law under Delaware law.

**B. BAC's Admissions In The 2026 Order Prove <u>Its Directors' Failure To Comply With The 2024 Order</u>**

63. In 2026 FinCen imposed another Order on BAC. In that Order, BAC made material, factual admissions as part of its resolution of the enforcement actions:

> Bank of America admits that it willfully violated the BSA and failed to (1) implement and maintain an AML program that met the minimum requirements of the BSA and FinCEN's implementing regulations, (2) conduct due diligence for correspondent accounts for foreign financial institutions, and (3) file suspicious activity reports (SARs).

64. Among the conclusions in the 2026 FinCen Order:

> BAC "willfully failed to implement and maintain an AMC program that met several of the BSA's requirements;"
>
> BAC "failed to file timely and accurate SARS on suspicious transactions totaling over $5 billion dollars . . . implicating national security related and other priority illicit finance risk";
>
> BAC "willfully failed to conduct due diligence on correspondent accounts in the United States for foreign financial institutions;"
>
> BAC "willfully failed to accurately and timely report suspicious transactions to FinCen;"

65. The FinCen Order further found:

> BAC "prioritized the revenue associated with customer relationships" . . . with "multiple high risk customers initially recommended for off-boarding."

66. FinCen identified the following violations:

> The central failures identified through FinCEN's investigation involved deficiencies related to Bank of America's suspicious transaction identification and reporting and customer due diligence CDD) processes. As these issues arose, Bank of America prioritized its revenues and minimized the impact on its required compliance resources. The nature and extent of the Bank's resulting reliance on law enforcement inquiries, requests by other financial institutions, and similar interventions over its own internal, automated controls to identify potentially suspicious activity meant that the Bank effectively outsourced to third parties a substantial portion of its proactive detection and reporting obligations. The Bank also allowed suspicious activity to accumulate uninvestigated for extended periods without investigation, resulting in late reporting of limited utility to law enforcement.
>
> Bank of America maintained this approach and failed to take meaningful action even in the face of testing that highlighted significant problems. Similarly, the Bank's CDD processes failed to account for customers' extensive reliance on payments from unknown third parties. The Bank failed to timely and meaningfully respond to mounting red flags involving these customers-including potential ties to narcotics trafficking proceeds-even after

> compliance personnel escalated concerns related to possible trade-based money laundering and fraud.

67. The FinCen Order cited the fact that "the Bank and its affiliates have been the subject of other actions by regulators of criminal authorities including supervisory and oversight failures." It also noted:

> BAC's "willful violations of the BSA . . . were systemic and implicated multiple core aspects of its AML program."

68. Accordingly, FinCen imposed a Civil Money Penalty of $1,200,000,000 against which would be credited the $750,000,000 imposed by OCC for its separate but parallel investigation.

69. On October 12, 2026 Bank of America and OCC entered into a Consent Order signed by Defendants Moynihan, Nowell III, Allen, Almeida, Donald, Lozano, Martinez, Ramos, Rose, White, Woods and Zuber. The "2026 OCC Consent Order."

70. The 2026 OCC Consent Order imposed a Civil Money Penalty of $750,000,000.

71. The Consent Order was signed by defendant directors Moynihan, Allen, Almeida, de Weck, Donald Hudson, Lozano, Nowell III, Ramos, Rose, White, Woods and Zuber. These defendant overtook affirmative obligations under the 2024 Consent Order. The 2024 Consent Order was issued pursuant to the OCC's statutory power (12 U.S.C. § 1818) and constitute legally binding federal administrative decrees. Hence they are based upon the OCC's supervisory and statutory powers under federal law and are not merely matters of private contract law.

72. The OCC found:

> <u>Deficient And Ineffective Compliance Program</u>
>
> The OCC's penalty is in response to Bank of America's violations of the Bank Secrecy Act and its implementing regulations, including 12 CFR 21.21 and 12 CFR 21.11. The Bank is also subject to a December 2024 cease-and-desist order (2024 Order), which

> required the bank to address its deficient BSA/AML compliance program.
>
> The Bank's BSA/AML compliance program is deficient and ineffective. Its transaction monitoring system resulted in the Bank failing to properly monitor trillions of dollars in transactions. This caused large numbers of late SARs involving billions of dollars. Many of the late SARs had indicia of money laundering. The Bank knew for years that it was failing to escalate potentially suspicious activity to investigators for review to determine if a SAR should be filed but failed to correct this serious BSA violation.
>
> In addition, the Bank's BSA Officer and staff lacked sufficient skills and expertise to effectively manage its BSA/AML program. Key BSA personnel did not receive appropriate training regarding suspicious activity identification, investigation, and reporting, which resulted in inaccurate and late SARs. The BSA audit function failed to identify longstanding BSA concerns that examiners subsequently uncovered.

## C. Materially False And Misleading SEC Filings Issued And/Or Signed By Defendants

### 1. Bank of America's Material Omissions and Misleading Partial Disclosures In Forms 10K

73. Bank of America has publicly represented that the Bank "is subject to extensive laws, rules, and regulations in the U.S. and other jurisdictions where it operates regarding bribery and corruption, know-your-customer requirements, anti-money laundering, embargo programs and economic sanctions" according to Bank of America's Form 10-k filed with the Securities and Exchange Commission on February 20, 2024. The Bank continues, "[f]or example, we are subject to the U.S. Bank Secrecy Act (BSA) which contains anti-money laundering and financial transparency laws designed to detect and deter money laundering and the financing of terrorism, as well as record-keeping, reporting, due diligence, and customer verification requirements, various sanctions programs administered and enforced by the [Treasury Department.]"

74. With respect to Compliance and Operational Risk Management, the same filing, states: "[wle are subject to comprehensive regulation under federal and state laws, rules, and regulations in the U.S. and the laws of the various jurisdictions in which we operate, including those related to financial crimes and anti-money laundering, market conduct, trading activities, fair lending, privacy, data protection, and unfair deceptive or abusive acts or practices." *Id.,* at 79.

75. The Bank states, "[our] global compliance and operational risk teams independently assess compliance and operational risk, monitor business activities and possess [ ... ] control functions for adherence to applicable laws, rules, and regulations, including identifying issues and risks, and reporting on the state of the control environment." *Id.*

76. In February 2025 BAC filed its Annual Report on Form 10-K for the year ended December 31, 2024. On February 25, 2026, Bank of America filed its Annual Report on Form 10-K for the year ended December 31, 2025. The Forms 10-K, were both signed by all the director defendants, contained statements in Note 12, "Commitments and Contingencies," substantially similar to those set forth in 24 above concerning the scope of the Consent Order, the Company's remediation efforts, and the expected financial impact of its compliance failures.

77. The 2025 Form 10-K revised the risk factor quoted above, removing the requirements." Despite that revision, the Company continued to describe additional penalties as a potential consequence of noncompliance without disclosing BANA's ongoing failure to adequately address the deficiencies underlying the December 2024 Consent Order:

> The terms of settlements, orders and agreements that we have entered into with government entities and regulatory authorities have also imposed, or could impose, significant operational and compliance costs, including enhancements to our procedures and controls, losses with respect to fraudulent transactions perpetrated against our clients, expansion of our risk and control functions within our lines of business, investment in technology and the hiring of significant numbers of additional risk, control and compliance

> personnel. ***For example, in December 2024, the OCC issued a Consent Order against BANA relating to certain aspects of its BSA, anti-money laundering and economic sanctions compliance programs, and we continue to respond to requests for information about similar aspects of such programs from other regulators. Failure to meet the requirements of such settlements, orders or agreements, or, more generally, the failure to maintain risk and control procedures and processes that meet the heightened standards established by our regulators and other government authorities, could result in further settlements, orders or agreements and additional fines, penalties or judgments, or material regulatory restrictions on our businesses.***

78. While this representation, and representations like it, exist in numerous materials, Bank of America deliberately failed to adhere to it.

79. These statement were contradicted by Findings of FinCen and the OCC. According to the Orders:

> 1. The Bank willfully failed to implement and maintain adequate internal controls for AML and BSA compliance, primarily due to critical deficiencies and gaps in its proprietary transaction monitoring system, which resulted in both missed and delayed detection reporting by the Bank of over $5 billion of suspicious activity, with roughly $1 billion of this activity implicating national security-related and other priority /illicit finance risks, including suspicious transactions indicative of Chinese money laundering networks, fraud, and potential trade-based money laundering with a substantial nexus to the southwest border.
>
> 2. The Bank lacked primary controls used to fulfill its obligation to identify and report suspicious activity. This included, but was not limited to, large volumes of suspicious activity implicating national security-related and other priority illicit finance risks, including over $600 million of transactions with trade-based money laundering involving salvaged vehicles and hundreds of millions of dollars of transactions consistent with Chinese money laundering networks.

80. To compound matters, Bank of America lacked the staff necessary to keep up with flagged transactions and Bank of America's staff were aware that certain customers were tied to high-risk activity. Indeed, other financial institutions even flagged the exact same pattern of

activity of concern, but Bank of American failed to appropriately monitor or report such activity. Bank of America's independent testing program functions also failed to properly detect and describe issues as mentioned above, even though that testing program was the primary internal control to comply with the obligations to identify and report suspicious activity.

81. With respect to many transactions, the Bank failed to adequately consider customers' international business activities, geographic footprints, and exposure to high-risk jurisdictions -with elevated trade-based money laundering and sanctions evasion risks. As part of this, the Bank was deficient -it failed to adequately maintain and update customer information on a risk basis, even ignoring observations made from one quarter to another.

82. Other concerns tied to the Bank's willful failures included suspicious activity related to scam activity, with internal case notes stating that one customer engaged in "numerous cases with scam activity, romance scams, Nigerian scams, and COVID [related scams]." Yet the bank failed to adequately act.

83. The undisclosed information was material because it concerned a significant limitation on the financial-crime controls associated with the services Defendant was offering. Defendant possessed superior knowledge of the relevant deficiencies, which were internal to its banking operations and not reasonably ascertainable by ordinary customers.

### 2. The 2026 Proxy<br>__The Materially Misleading Proxy Solicitation__

84. In 2026 Bank America shareholders offered two proposals for a shareholder vote at the annual meeting.

85. Proposal 4 was a proposal "requesting an independent board chair." The BAC directors recommended a vote against Proposal 4 one of the reasons provided to solicit votes against Proposal 4 was:

> Our current Board leadership structure and governance provides rigorous and effective Independent Board oversight.

**D. The Truth Emerges**

86. The truth behind Defendants' misrepresentations began to emerge after the market closed on October 13, 2026, when the U.S. Department of the Treasury announced coordinated enforcement actions against BANA resulting in more than $1.21 billion in penalties and settlements for BSA/AML and sanctions violations. Specifically, FinCEN assessed a $1.2 billion penalty, including credit for a $750 million penalty imposed by the OCC, while OFAC separately announced an $11.6 million settlement concerning apparent sanctions violations.

87. The enforcement actions revealed that BANA's compliance failures were systemic and extended across its business lines. FinCEN found that deficiencies in BANA's primary transaction-monitoring system "necessarily spanned the Bank's various business lines" and were not confined to a particular product or service. The OCC found that, since at least 2019, BANA had failed to properly monitor trillions of dollars in transactions, resulting in missed, late, inaccurate, and incomplete suspicious activity reports involving billions of dollars. Between 2019 and 2023, BANA management, including the then-BSA Officer, had received written reports BANA failed to timely and accurately report more than $5 billion in suspicious transactions, including more than $1 billion implicating national security and other priority illicit finance risks. BANA admitted the facts and violations set forth in FinCEN's order.

88. The enforcement actions also revealed that fundamental compliance deficiencies persisted despite the December 2024 Consent Order and Defendants' assurances concerning BANA's remediation progress. The OCC expressly found that BANA "has not made sufficient progress in addressing its multiple internal control weaknesses since the 2024 Order was issued" and had merely "begun to implement some of the many significant changes needed" to establish

an effective and compliant program. The OCC further found that BANA's BSA/AML program remained deficient as of October 13, 2026, with continuing internal-control gaps. Its investigative backlog had peaked at nearly 200,000 cases in 2024, and implementing revised transaction monitoring required the Company to onboard thousands of additional investigators. FinCEN likewise found that management prioritized limiting resource demands over adequate remediation and that BANA likely saved hundreds of millions of dollars in compliance expenditures through its failures.

89. The truth continued to emerge before the market opened on October 14, 2026, when Bank of America reported third quarter 2026 results showing that the $1.2 billion regulatory settlement charge reduced diluted earnings per share by $0.17. During the Company's earnings call later that morning, analysts directly challenged Defendants' prior assurances and questioned whether the Company's compliance problems were truly behind it. UBS analyst Erika Najarian observed that the stock's decline suggested "more than just the results," pointing to "a confidence issue, perhaps deepened by the consent order." Najarian questioned whether the required third-party review would result in additional expenses and asked how management could restore investor confidence given expenses that had already exceeded expectations. J.P. Morgan analyst Vivek Juneja echoed those concerns, describing the charge as "obviously a surprise" and as "a reputational and confidence issue." Juneja then pressed management for concrete remediation milestones demonstrating that the problems were "actually now truly behind us as opposed to the risk of more charges or more expenses."

90. Following the enforcement announcements and the Company's disclosure of their impact on its third-quarter earnings, Bank of America's stock price fell to an intraday low of $49.26

on October 14, 2026, before closing at $51.39, **down 4.8%** from the previous day's closing price of $53.96.

## VI.

## DEMAND FUTILITY

91. Pre-suit demand on the Board of BAC is futile and, therefore, excused. Every currently sitting BAC board member is also a named defendant herein because they served as a board member during the misconduct alleged herein.

92. At the time of filing of the original complaint, the Board consisted of Defendants Brian T. Moynihan, Lionel L. Nowell III, Sharon L. Allen, Jose E. Almeida, Arnold W. Donald, Jim Fitterling, Monica C. Lozano, Maria W. Martinez, Denise L. Ramos, Clayton S. Rose, Will B. Thomas, Michael D. White, Thomas D. Woods and Maria T. Zuber.

93. Plaintiff need only allege demand futility as to a majority of the fourteen Directors that were on the Board (the "Demand Board") when this complaint was filed. At least 7 board members are conflicted and not independent and demand as to them would be futile.

94. "Delaware law does not charter law breakers." *See e.g., In Re Masser Energy*. Therefore, the business judgment rule does not shield violations of positive law nor can director "law breakers, invoke, or be protected by DCGL Sec. 102(b)(7).

95. Positive law violations described here arise of out clear statutory and/or regulatory infractions with severe public harm (as per the 2026 Order ("Findings")) and mission-critical legal obligations. The defendant directors' positive law violations were accompanied by defendants' misrepresentations of law compliant status in Annual Reports on Form 10-K signed by the director defendants in 2025 and 2026 and Proxy Statements issued by BAC and included false and misleading statements soliciting shareholder actions.

96. The Caremark claims alleged herein are based on the defendant directors' failure to oversee BAC's affirmative violations of positive law and each defendant's failure to comply with the 2024 Consent Order obligations specifically imposed upon BAC's "Board" by the terms of the 2024 Order.

## VII.

## COUNT

## AGAINST THE INDIVIDUAL DEFENDANTS FOR UNEXCULPATED BREACH OF FIDUCIARY DUTIES

97. Plaintiff restates and incorporates the preceding allegations as though fully detailed herein.

98. The Individual Defendants were entrusted legal duties under the 2024 Cease and Desist Consent Order and their duties under committee charters and with Delaware law imposed fiduciary responsibilities toward the Company. Officers also owe fiduciary duties to a Delaware corporation. By virtue of these legal obligations and fiduciary relationships, the Individual Defendants were obligated to uphold the highest standards of good faith, equitable dealings, loyalty, and due diligence in their actions.

99. The Individual Defendants violated and breached their fiduciary duties, including duties of loyalty and good faith as demonstrated above.

100. As a consequence of the misconduct alleged herein, the Individual Defendants bear liability to the Company. The Company has incurred damages, both financial and non-monetary, as a direct and proximate outcome of the Individual Defendants' breach of fiduciary duties.

101. Plaintiff, as a shareholder of BAC and on behalf of BAC, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff prays for relief and judgment, as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of BAC and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C. Directing BAC to take all necessary actions to reform and improve its corporate governance and internal procedures to protect BAC and its stockholders from a repeat of the damaging events described herein, including.

D. Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses;

E. Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 17, 2026

Respectfully submitted,

**SQUITIERI & FEARON, LLP**

*/s/ Lee Squitieri, Esq.*

Lee Squitieri
205 Hudson Street, 7th Floor
New York, New York 10013
Email: lee@sfclasslaw.com
Phone: (212) 421-6492

Attorneys for Plaintiff

## VERIFICATION

I, Amelia Coon, am the plaintiff in the within action. I have reviewed the allegations made in the foregoing Verified Stockholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I further verify that I am a current holder, and have been a holder, of common stock at all relevant times.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this day as set forth below.

October 26, 2026

AMELIA COON